UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
JAY KOSACK,                                     :
                             Plaintiff,         :
                                                :
v.                                              :          **OPINION AND ORDER**
                                                :
ENTERGY ENTERPRISES, INC.; ENTERGY              :          14 CV 9605 (VB)
NUCLEAR OPERATIONS, INC.; ENTERGY               :
SERVICES, INC.; and ENTERGY NUCLEAR             :
NORTHEAST,                                      :
                             Defendants.        :
-----------------------------------------------------------------x

Briccetti, J.:

        Plaintiff Jay Kosack brings this action against defendants Entergy Enterprises, Inc.,

Entergy Nuclear Operations, Inc., Entergy Services, Inc., and Entergy Nuclear Northeast,

alleging violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12111, et seq.,

the Energy Reorganization Act ("ERA"), 42 U.S.C. §§ 5851, et seq., the Family and Medical

Leave Act ("FMLA"), 29 U.S.C. §§ 2601 et seq., the Fair Labor Standards Act ("FLSA"), 29

U.S.C. §§ 201 et seq., and the New York State Human Rights Law ("NYSHRL"), N.Y. Exec.

Law § 296 in connection with his employment at the Indian Point Energy Center ("Indian

Point"), a nuclear power facility in Buchanan, New York.[1]

        Now pending before the Court is defendants' motion for summary judgment. (Doc. #74).

        For the following reasons, the motion is GRANTED IN PART and DENIED IN PART.

        The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367.

---

[1]      In his third amended complaint, plaintiff alleged a violation of the New York State Labor
Law but withdrew that claim in his opposition to the instant motion. (See Doc. #86 at 1 n.1).

# BACKGROUND

The parties have submitted briefs; affirmations, affidavits, and declarations with exhibits; and statements of material fact pursuant to Local Civil Rule 56.1, which reflect the following factual background.

As an initial matter, plaintiff worked at Indian Point for thirteen years. His claims against his employer can be grouped into four periods: (i) employment in the Security Department (2003 to 2013); (ii) the Human Capital Management process (2014); (iii) employment as a receipt inspector (2014 to 2016); and (iv) termination (2016).

## I. Security Department

In May 2003, plaintiff began his employment at Indian Point with Entergy Nuclear Operations, Inc. ("Entergy" or the "company") as a nuclear security officer. His responsibilities included vetting and processing individuals and vehicles; securing and assisting at accidents, fires and similar events; detecting contraband, and performing other security-related tasks. The company required nuclear security officers be qualified to operate a firearm. In February 2004, plaintiff was promoted to lieutenant.

### A. 2005 Medical Issues and Accommodations

In 2005, plaintiff began experiencing severe dizziness and took a disability leave for two to three weeks. Plaintiff returned to work, but his condition did not improve, and he took a five- or six-month medical leave designated partially as FMLA leave. On September 2, 2005, plaintiff was evaluated by his neurologist Dr. Stephen Klass, who diagnosed plaintiff with vertigo secondary to labyrinthine dysfunction.

Prior to returning to work from his medical leave, Entergy requested that plaintiff see Dr. Peter C. Gay for an additional medical examination. On September 30, 2005, Dr. Gay concluded

that due to the risk of loss of balance, plaintiff "should not engage in armed security activities or work on unguarded elevated surfaces i.e. ladders, scaffolds."  (Doc. #75 ("Kozak Aff.") Ex. J at 1).  Entergy permitted plaintiff to return to work in the Security Department and perform administrative, nonsupervisory tasks consistent with his limitations.  Because of plaintiff's medical restrictions, he could not qualify with a firearm or supervise operational teams or security officers.

On August 20, 2007, plaintiff was promoted to the equivalent of a security operations supervisor, although he continued not to supervise security officers because of his medical condition.  As one of five operations supervisors, plaintiff reported to the security shift supervisor.

B.      2009 Medical Evaluations and Accommodations

On March 31, 2009, neurologist Dr. Klass examined plaintiff again, concluding that because of plaintiff's vertigo condition, plaintiff "should not be required to perform armed security duties; should not be permitted to perform activities which require him to change body-head position like going up and or down stairs; [and] should not be required to work at heights and or near moving machinery." (Kozak Aff. Ex. M at 1).

By letter signed October 9, 2009, an Entergy human resources manager requested that Dr. Klass provide his medical opinion as to whether plaintiff could safely perform his job, and if so, provide additional information regarding the duration of plaintiff's condition and possible accommodations.  Plaintiff met with Dr. Klass that day.  Dr. Klass found that plaintiff suffered from episodic bouts of vertigo that could cause dizziness at any time and provided the following three work restrictions:  "[1] not to work at heights; [2] not to work near moving machinery;

[3] to avoid activities-duties that require changing head-body positions[,] [s]uch as bending [and] going up and down stairs frequently." (Kozak Aff. Ex. O at 2).

On January 7, 2010, Entergy's Dr. Gay evaluated plaintiff again and stated by letter that plaintiff's vertigo was a long-term or permanent condition. He noted that while plaintiff could moderate the severity of his dizziness by slowly changing positions, plaintiff should not perform tasks that required fast-moving actions.

Entergy provided accommodations to enable plaintiff to continue as a security operations supervisor, including exempting plaintiff from the firearms requirement, providing transportation for plaintiff around the plant as necessary, and allowing him to work remotely in the event of flare-ups of his condition.

C.      2012 Medical Issues and Accommodations

In 2012, plaintiff was diagnosed with degenerative disc disease in his back. Entergy allowed plaintiff to take FMLA leave from February 15 to April 3, 2012. With Entergy's consent, plaintiff extended his FMLA leave until May 8, 2012, and then used short-term disability leave until June 19, 2012. On June 19, 2012, plaintiff's doctor recommended a fifteen-pound weight restriction for three months upon plaintiff's return to work.

Entergy also required plaintiff to see Dr. Gay, who confirmed the lifting restriction and acknowledged that plaintiff should use a cane for walking and standing. Entergy agreed to those accommodations and plaintiff returned to work.

II.     Human Capital Management

At the beginning of 2013, Entergy employees were notified there would be a companywide jobs assessment known as Human Capital Management ("HCM"). The assessment affected all positions across the company, not just positions at Indian Point. In the

HCM process, the company sought to "plac[e] the right people with the right skills in the right positions." (Doc. #88 ("Bellantoni Decl.") Ex. 4 at 4). However, qualified incumbents could (and did) retain their positions.

The assessment proceeded in three rounds for management, supervisors, and others, respectively. As part of the HCM assessment, the Indian Point Security Department reduced the number of operations supervisors from five to four and required all four be firearms-qualified. Plaintiff, who could not qualify with a firearm, was not retained as an operations supervisor. Entergy retained the other four operations supervisors and the shift supervisor Terrance Thivierge, whose position required him to oversee the operations supervisors but did not require him to carry a firearm.

Plaintiff then applied for nine available positions within the company. Plaintiff interviewed for positions as a quality specialist (later known as a receipt inspector), procurement specialist, and warehouse supervisor, and he was offered an interview for a financial analyst position. Before interviewing for the financial analyst position, plaintiff accepted the quality specialist position in about January 2014 and canceled the remaining interview. Plaintiff reported to John Schaefer and Chris Woodruff, the warehouse facility supervisor.

Quality specialists were tasked with performing inspections, examining and testing purchased material to ensure materials were received as ordered, reviewing and approving inspections, and deciding whether materials were cleared for acceptance and use at Indian Point. They also oversaw the receipt inspection office and provided technical support, and they developed and maintained training procedures and qualified new inspectors. Quality specialists also performed "warehousing functions as required." (Kozak Aff. Ex. II at 1). Quality specialists were required to have experience in "nuclear power design, construction,

maintenance, operations, and warehouse," as well as knowledge of nuclear and other regulatory quality requirements. (Id.).

III.    Quality Specialist/Receipt Inspector

    A.    2014 Accommodations

On April 20, 2014, with supporting medical documentation, plaintiff requested the following accommodations for the quality specialist position: a fifteen-pound lifting restriction; restrictions on the use of ladders or narrow and raised platforms; access to a vehicle to avoid having to walk long distances; and the ability to use a cane when needed. Entergy agreed to provide those accommodations.

    B.    Reclassification As Receipt Inspector

On June 10, 2015, Entergy notified plaintiff and all quality specialists that their position was reclassified to receipt inspector and, as such, they were eligible for overtime pay. Quality specialists were previously not eligible for overtime. Entergy made the change in overtime eligibility retroactive to January 1, 2015, and plaintiff received overtime pay for hours worked beyond forty hours per week in 2015.

    C.    September 2015 Scheduled Outage

In September 2015, the company initiated a scheduled outage, or temporary facility shutdown, and required twelve-hour shifts by plaintiff and the other receipt inspector Joseph D'Annible in case of emergent inbound material and to address a growing backlog of materials for inspection. Plaintiff worked twelve-hour shifts for the next thirteen of fourteen days. Mr. D'Annible did the same except for the first four or five days when he was on a pre-scheduled vacation.

On September 22, 2015, plaintiff emailed Mr. Schaefer, his supervisor, said the twelve-hour shift was negatively affecting his health, and requested the ability to leave his shift early. Two days later, plaintiff emailed Schaefer again to say that he was returning to a day schedule and could no longer work twelve-hour night shifts during the outage.

D.     2016 Medical Issues

On January 11, 2016, plaintiff emailed Chris Woodruff, the warehouse facility supervisor, a note from his doctor, Dr. Thomas Robinson, stating plaintiff was experiencing an "acute medical problem" and that he was unable to work until at least January 13, 2016. (Kozak Aff. Exs. EEE & FFF). The next day, plaintiff emailed Mr. Woodruff again that plaintiff's blood pressure was "very high" and that he was experiencing other issues. (Kozak Aff. Ex. GGG). On January 13, 2016, plaintiff submitted a second note from Dr. Robinson, which said plaintiff was being treated for an "acute medical problem" and was unable to work until at least January 18, 2016. (Kozak Aff. Ex. HHH). The same day, plaintiff emailed Mr. Schaefer and said doctors were working to "minimize the risk of stroke or heart attack" as quickly as possible. (Kozak Aff. Ex. III). Plaintiff requested short-term disability and FMLA paperwork because he was uncertain when he would be able to return to work.

On January 18, 2016, plaintiff submitted a third note from Dr. Robinson indicating plaintiff would return to work with his usual precautions and restrictions on January 25, 2016. The same day, Dr. Robinson submitted an FMLA certification that requested: (i) plaintiff's excused absence from work from January 11 to January 24, 2016; (ii) a temporary reduction in plaintiff's hourly schedule to ten hours a day, five days a week, from January 25 to February 25, 2016; and (iii) plaintiff's absence if his elevated blood pressure caused flare-ups, which could result in vertigo and "unsafe working conditions." (Kozak Aff. Ex. KKK). Dr. Robinson also

noted "a shorter workweek will not aggravate [plaintiff's] chronic inner ear disorder as much." (Id.).

Entergy considered it essential that all employees at nuclear sites be able to work twelve hours a day in the event of planned outages or emergencies. For the quality specialist position (reclassified to receipt inspector in 2014), the written job description states: "As a provider of essential services, Entergy expects its employees to be available to work additional hours, to work in alternate locations, and/or to perform additional duties in connection with storms, outages, emergencies, or other situations as deemed necessary by the company." (Kozak Aff. Ex. II at 2). Furthermore, Entergy policy outlining personnel expectation related to an emergency response states all employees at Entergy nuclear sites must be able to provide "emergency response" and "outage support." (Kozak Aff. Ex. XXX at 2).

Before plaintiff's return to work, Entergy asked plaintiff to undergo an independent medical examination to ensure he could safely perform his job. On February 16, 2016, Dr. Winston C. Kwa, a specialist in occupational and internal medicine, evaluated plaintiff and assessed whether plaintiff could safely perform the functions of a receipt inspector, and if not, whether there were available accommodations. Based on his medical examination, Dr. Kwa initially concluded that plaintiff was fit to return to work with certain restrictions, provided he was also cleared to return to work by his cardiologist due to his elevated blood pressure and heart rate. A day later, however, when completing the company's "Job Accommodation Medical Information Request," Dr. Kwa determined plaintiff could not work more than ten hours per day, limiting plaintiff to eight hours a day with two hours of overtime. (Kozak Aff. Ex. RRR).

IV.    Termination

On March 7, 2016, Entergy notified plaintiff he would be terminated.  Upon reviewing Dr. Kwa's evaluation, the company determined plaintiff could not work twelve hours a day, and therefore could not perform an essential function of his job, namely, its overtime requirements. (Kozak Aff. Ex. TTT).  Plaintiff asked to be considered for other positions at Indian Point.

On March 22, 2016, the company asked Dr. Kwa to clarify whether the ten-hour restriction also applied to other positions at Indian Point.  Dr. Kwa found the ten-hour daily restriction applied to plaintiff's work in any position.  Because Entergy expects all employees to work shifts of at least twelve hours in planned outages or emergencies, the company refused to consider plaintiff for employment in another role.  A company representative so notified plaintiff on March 23, 2016.

On April 1, 2016, plaintiff received final notice through his counsel that Entergy was terminating his employment.  Since January 11, 2016, plaintiff had been on a combination of FMLA and paid leave.  The leave ended on April 11, 2016.  Plaintiff later applied for short-term and long-term disability benefits.

## DISCUSSION

I.    Legal Standard

The Court must grant a motion for summary judgment if the pleadings, discovery materials before the Court, and any affidavits show there is no genuine issue as to any material fact and it is clear the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

A fact is material when it "might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary" are not material and thus cannot preclude summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

A dispute about a material fact is genuine if there is sufficient evidence upon which a reasonable jury could return a verdict for the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 248. The Court "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." Wilson v. Nw. Mut. Ins. Co., 625 F.3d 54, 60 (2d Cir. 2010) (citation omitted). It is the moving party's burden to establish the absence of any genuine issue of material fact. Zalaski v. City of Bridgeport Police Dep't, 613 F.3d 336, 340 (2d Cir. 2010).

If the non-moving party has failed to make a sufficient showing on an essential element of his case on which he has the burden of proof, then summary judgment is appropriate. Celotex Corp. v. Catrett, 477 U.S. at 323. If the non-moving party submits "merely colorable" evidence, summary judgment may be granted. Anderson v. Liberty Lobby, Inc., 477 U.S. at 249–50. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation." Brown v. Eli Lilly & Co., 654 F.3d 347, 358 (2d Cir. 2011) (internal citations and quotation omitted). The mere existence of a scintilla of evidence in support of the non-moving party's position is likewise insufficient; there must be evidence on which the jury could reasonably find for him. Dawson v. Cty. of Westchester, 373 F.3d 265, 272 (2d Cir. 2004).

On summary judgment, the Court construes the facts, resolves all ambiguities, and draws all permissible factual inferences in favor of the non-moving party. Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 780 (2d Cir. 2003). If there is any evidence from which a

reasonable inference could be drawn in favor of the non-moving party on the issue on which summary judgment is sought, summary judgment is improper. See Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 82–83 (2d Cir. 2004).

In deciding a motion for summary judgment, the Court need only consider evidence that would be admissible at trial. Nora Beverages, Inc. v. Perrier Grp. of Am., Inc., 164 F.3d 736, 746 (2d Cir. 1998).

II.      Discrimination under the ADA

While plaintiff brings claims under several statutes, the gravamen of his suit is that Entergy discriminated against him because of his disability in violation of the ADA. Therefore, the Court will begin with an analysis of the ADA.

The ADA makes it unlawful for an employer to "discriminate against a qualified individual on the basis of disability in regard to," among other things, the "discharge of employees." 42 U.S.C. § 12112(a). Disability discrimination claims are evaluated under the familiar burden-shifting analysis established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See McBride v. BIC Consumer Prods. Mfg. Co., 583 F.3d 92, 96 (2d Cir. 2009). The McDonnell Douglas analysis proceeds in three steps: "A plaintiff must establish a prima facie case; the employer must offer through the introduction of admissible evidence a legitimate non-discriminatory reason for the discharge; and the plaintiff must then produce evidence and carry the burden of persuasion that the proffered reason is a pretext." Sista v. CDC Ixis N. Am., Inc., 445 F.3d 161, 169 (2d Cir. 2006).

First, "[t]o establish a prima facie case under the ADA, a plaintiff must show by a preponderance of the evidence that: (1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions

of his job, with or without reasonable accommodation; and (4) he suffered adverse employment

action because of his disability." Sista v. CDC Ixis N. Am., Inc., 445 F.3d at 169 (internal

quotation omitted). Plaintiff need only make a de minimis showing to establish a prima facie

case. Zimmermann v. Assocs. First Capital Corp., 251 F.3d 376, 381 (2d Cir. 2001). At the

second step of the McDonnell Douglas analysis, the employer bears the burden of putting forth a

legitimate, non-discriminatory reason for plaintiff's termination. McBride v. BIC Consumer

Prods. Mfg. Co., 583 F.3d at 96. At the third step, a plaintiff must present "sufficient admissible

evidence from which a rational finder of fact could infer that more likely than not [plaintiff] was

the victim of intentional discrimination." Bickerstaff v. Vassar Coll., 196 F.3d 435, 447 (2d Cir.

1999).[2]

III.     Security Department

    A.      Pre-2013 Claims Under the ERA, FMLA, and NYSHRL

        Defendants argue plaintiff's claims under the ERA, FMLA, and NYSHRL that arose

before February 2013 are untimely.

        In his opposition, plaintiff withdrew claims under the FMLA related to his work in the

Security Department and failed to defend the timeliness of his claims under the ERA and

NYSHRL related to the Security Department. The Court deems these claims abandoned.

Jackson v. Fed. Exp., 766 F.3d 189, 198 (2d Cir. 2014) (finding "a court may, when appropriate,

infer from a [counseled] party's partial opposition that relevant claims or defenses that are not

defended have been abandoned.").

---

[2]     The Second Circuit has noted it is uncertain whether ADA discrimination claims must
proceed on a but-for or a mixed-motive theory after the Supreme Court's decision in Gross v.
FBL Financial Services, Inc., 557 U.S. 167 (2009). See Forrester v. Prison Health Servs., Inc.,
651 F. App'x 27, 28 (2d Cir. 2016) (summary order).

Accordingly, plaintiff's ERA, FMLA, and NYSHRL claims related to his work in the Security Department are dismissed.

B.     Disparate Treatment Under the ADA

Plaintiff's vague claim that he was paid less than his non-disabled peers in the Security Department from 2005 to December 2013 in violation of the ADA appears to assert a disability-based disparate treatment claim under the ADA.

Defendants argue plaintiff fails, as a matter of law, to demonstrate he was similarly situated to other employees in materially relevant respects.

The Court agrees.

A plaintiff can raise an inference of discrimination by demonstrating the disparate treatment of similarly situated employees but "must show she was similarly situated in all material respects to the individuals with whom she seeks to compare herself." Mandell v. Cnty. of Suffolk, 316 F.3d 368, 379 (2d Cir. 2003) (internal citation and quotation omitted).

Plaintiff has made no such showing and the record reflects few, if any, facts that demonstrate other employees were similarly situated.  Moreover, plaintiff concedes that from 2005 to 2013, he performed administrative, nonsupervisory tasks consistent with his medical limitations and was not firearms-qualified, unlike other operations supervisors.

Accordingly, defendants are entitled to summary judgment on plaintiff's claim for disparate treatment related to the Security Department.

IV.    Human Capital Management

    A.    FMLA and ERA Claims

    In his opposition, plaintiff withdrew his FMLA claim related to HCM and failed to oppose defendants' argument against his ERA claim related to HCM.  Accordingly, these claims are deemed abandoned and are dismissed.  See Jackson v. Fed. Exp., 766 F.3d at 198.

    B.    Discrimination under the ADA

    Defendants argue plaintiff fails, as a matter of law, to demonstrate he was not selected to be shift supervisor because of his disability.[3]

    The Court agrees.

    Before HCM, the shift supervisor position was held by Terrance Thivierge.  Mr. Thivierge remained shift supervisor after the HCM process.  The shift supervisor position, therefore, was not vacant.  Keeping qualified incumbents in their existing positions was not prohibited in the HCM, and in fact occurred within the Security Department and other departments.  Even though the position would have accommodated plaintiff's disability, an employer does not have an obligation to displace a more senior incumbent to accommodate another employee's disability.  See Romano v. Chautauqua Opportunities, Inc., 559 F. App'x 103, 104 (2d Cir. 2014) (summary order).

    Accordingly, defendants are entitled to summary judgment on plaintiff's disability discrimination claim with respect to the HCM process.

_____

[3]    In his opposition, plaintiff concedes he was no longer qualified to be an operations supervisor.

V.      Receipt Inspector

Plaintiff brings three claims related to his employment as a receipt inspector:  (i) failure to engage in an interactive process in violation of the ADA, (ii) unpaid overtime in violation of the FLSA, and (iii) retaliation in violation of the ERA.

A.      Interactive Process

Plaintiff claims Entergy did not engage in the "interactive process" envisioned by the ADA during and after the HCM.  Plaintiff has not cited any authority for the existence of a standalone claim for failure to engage in an interactive process, and the Court is aware of none.  Moreover, to the extent plaintiff alleges a failure to accommodate claim under the ADA or NYSHRL, this claim fails as a matter of law.

"An employer may . . . violate the ADA by failing to provide a reasonable accommodation.  A plaintiff states a prima facie failure to accommodate claim by demonstrating that (1) plaintiff is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations."  See McMillan v. City of New York, 711 F.3d 120, 125–26 (2d Cir. 2013); Berger v. N.Y.C. Police Dep't, 304 F. Supp. 3d 360, 369 (S.D.N.Y. 2018) (applying same standard to NYSHRL claims for failure to accommodate).

It is undisputed that after plaintiff, who had worked for Entergy since 2003, applied for nine positions within the company, the company offered plaintiff four interviews.  Ultimately, the company offered plaintiff the quality specialist position, which plaintiff accepted.  Moreover, Entergy provided the accommodations plaintiff requested when he began as a quality specialist.

Thus, plaintiff fails as a matter of law to demonstrate that Entergy failed to accommodate his disability in the HCM process.

Accordingly, defendants are entitled to summary judgment on plaintiff's failure to accommodate claim during and after the HCM process.

B. <u>Unpaid Overtime</u>

Defendants argue plaintiff's claim under the FLSA for unpaid overtime from February to December 2014 fails because plaintiff's work as a quality specialist falls within the FLSA's administrative exemption.

The Court agrees.

The FLSA requires employers to compensate employees for overtime work at a rate of one-and-a-half times their regular salary for any hours worked over forty hours in a given week. 29 U.S.C. § 207(a). Overtime provisions do not apply, however, to employees working in an administrative capacity. <u>Id</u>. § 213(a)(1). The "administrative exemption" exempts from FLSA's overtime requirements employees (1) who "are compensated on a salary or fee basis at a rate no less than $455 per week; (2) [w]hose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and (3) [w]hose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance." <u>Indergit v. Rite Aid Corp.</u>, 293 F.R.D. 632, 637–38 (S.D.N.Y. 2013) (quoting 29 C.F.R. § 541.200(a)(1)–(3)).

The parties do not dispute plaintiff's salary was at least $455 per week. The job description for the quality specialist position describes non-manual inspections, examinations, and technical support, including testing purchased material to ensure it was received as ordered, reviewing inspections, and maintaining training procedures. While quality specialists performed

"warehouse functions," they only performed them "as required." (Kozak Aff. Ex. II at 1). Furthermore, plaintiff's accommodations restricted his performance of manual activities, such as lifting, using ladders, and walking long distances, and allowed him to use a cane as needed. The position also called for independent judgment in performing inspections and examining purchased materials honed after eight to twelve years of experience in nuclear power design, construction, maintenance, or operations.

Plaintiff raises no genuine dispute of material fact. Plaintiff argues that after a 2009 audit, Entergy planned to alter the duties of the quality specialist position to ensure the position qualified as exempt from FLSA's overtime requirements, but did not. The company's intentions and actions in 2009 are simply not relevant to the fact-specific analysis of plaintiff's duties and responsibilities in 2014. See Kadden v. VisuaLex, LLC, 910 F. Supp. 2d 523, 535 (S.D.N.Y. 2012). Plaintiff also argues that because Entergy reclassified the position as non-exempt in June 2015 when it was re-named receipt inspector, and because plaintiff's duties did not change after the position was reclassified, his previous work was also non-exempt. Despite mentions in the record about physical acts plaintiff performed as a receipt inspector, plaintiff provides no citation to record evidence showing that plaintiff's job as a quality specialist or receipt inspector was primarily manual, and a close reading of plaintiff's affirmation and deposition excerpts offer no indication whether that fact is supported in the record. Moreover, the accommodations Entergy provided plaintiff as a quality specialist (i.e., lifting restriction, ladder and platform restriction, vehicle access, and use of a cane when needed) tend to support a finding plaintiff's job was primarily non-manual.

In the absence of evidence to the contrary, defendants are entitled to summary judgment on plaintiff's FLSA claim for unpaid overtime.

C.     Retaliation

Defendants argue plaintiff's claim for retaliation under the ERA when he worked as a receipt inspector is untimely.

The Court agrees.

Employees who believe they have suffered retaliation in violation of the ERA may file a complaint alleging retaliation within 180 days after the alleged violation.  42 U.S.C. § 5851(b)(1).  The limitations period begins when the alleged "retaliatory act" is communicated to the employee.  See 29 C.F.R. § 24.103.

The alleged retaliatory act was plaintiff's termination, which occurred on April 1, 2016. Entergy first informed plaintiff on March 7, 2016, and again on March 23, 2016.  Relying on the final notice (April 1, 2016), under the 180-day rule, plaintiff would have had to file a complaint with the Occupational Safety and Health Administration by September 28, 2016.  Plaintiff did not file his complaint until October 4, 2016.

Accordingly, plaintiff's retaliation claim under the ERA is time-barred and dismissed.

VI.   Termination

Plaintiff brings three claims against defendants in connection with his termination: (i) employment discrimination and failure to accommodate under the ADA and NYSHRL, (ii) retaliation in violation of the ADA and NYSHRL, and (iii) interference with the FMLA.

A.     Employment Discrimination and Failure to Accommodate

Defendants argue plaintiff cannot make out a prima facie case for employment discrimination or failure to accommodate, because he cannot work overtime, an essential function of his job as a receipt inspector, with or without reasonable accommodations.

On the current record, the Court will not hold that working overtime is an essential function of the receipt inspector position. The Court, therefore, does not reach the question of whether plaintiff could perform that function with or without a reasonable accommodation.

To determine the essential functions of a job, "a court must conduct a fact-specific inquiry into both the employer's description of a job and how the job is actually performed in practice." McMillan v. City of New York, 711 F.3d 120, 126 (2d Cir. 2013) (internal quotation omitted). Evidence of an essential function includes, but is not limited to, (i) "the employer's judgment as to which functions are essential," (ii) a written job description, (iii) "the amount of time spent on the job performing the function," and (iv) "the work experience of past incumbents in the job." 29 C.F.R. § 1630.2(n)(3)(i–vii). Courts also consider the number of employees who perform that function, the specialization of the function, the consequences of not requiring the employee to perform the function, and current work experience of incumbents in similar jobs. Stone v. City of Mount Vernon, 118 F.3d 92, 97 (2d Cir. 1997). While courts give considerable deference to an employer's determination as to what functions are essential, no factor is dispositive. McMillan v. City of New York, 711 F.3d at 126.

Second Circuit cases emphasize the importance of the plaintiff's own experiences. For instance, in Stone v. City of Mount Vernon, the court held that fighting fires was not an essential function of a light-duty firefighter's position despite the fire commissioner's requirement that all firefighters be able to respond to a fire in case of an emergency. 118 F.3d 92, 99–101 (2d Cir. 1997). The court's holding turned on the fact that no light-duty firefighter had ever been called on to fight a fire. Id. at 101 (emphasis added). Similarly, in McMillan v. City of New York, the Second Circuit held timely arrival was not an essential function of the plaintiff's municipal job, because for many years the City had explicitly or implicitly approved plaintiff's late arrivals and

had a policy permitting flexible hours.  711 F.3d 120, 123 (2d Cir. 2013).  The court explained

that district courts must determine "how the job is actually performed in practice."  Id. at 126.

The following facts are undisputed.  The company considered it essential that all

employees at its nuclear power facilities be able to work overtime, because of possible

emergencies and scheduled outrages.  The written job description for the quality specialist

position (reclassified to receipt inspector) notes that overtime is expected.  Company policy

requires all employees to provide emergency and scheduled outage support.

The record does not, however, reflect when and how frequently receipt inspectors, like

plaintiff, actually worked overtime for outages.  (Defendants concede emergencies do not occur

often.)  It is undisputed that (i) planned outages occur about once per year and can last up to four

weeks, and (ii) during planned outages all employees are required to be available to work shifts

of at least twelve hours.  But it is unclear whether these planned outages have generally required

overtime by receipt inspectors.  The record reflects plaintiff worked twelve-hour shifts for

thirteen days during an outage in September 2015, but it remains unclear whether this was a

regular occurrence or an anomaly.

Drawing all reasonable inferences in plaintiff's favor, the Court finds there are genuine

issues of material fact as to whether working overtime was an essential function of plaintiff's job

as a receipt inspector.  Accordingly, summary judgment is denied as to plaintiff's claims for

disability discrimination and failure to accommodate in violation of the ADA and the NYSHRL.

B.    Retaliation

Plaintiff argues defendants retaliated against him by requiring him to undergo a medical

evaluation without justification.  Defendants do not contest plaintiff established a prima facie

case for retaliation but argue, as a matter of law, that they had a legitimate, non-discriminatory reason to require plaintiff to undergo a medical examination by Dr. Kwa in early 2016.

The Court agrees with defendants.

As noted above, the ADA makes it unlawful for a covered employer to "discriminate against a qualified individual on the basis of disability."  42 U.S.C. § 12112(a).  The ADA also makes it unlawful for an employer "to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e–3(a); Weissman v. Dawn Joy Fashions, Inc., 214 F.3d 224, 234 (2d Cir. 2000) (applying ADA analysis to plaintiff's retaliation claim under both ADA and NYSHRL).  Discussed above, the familiar three-step McDonnell Douglas burden-shifting framework applies.  Tse v. New York Univ., 2013 WL 5288848, at *16 (S.D.N.Y. Sept. 19, 2013).

Assuming, as defendants have, that plaintiff established a prima facie case, defendants had a legitimate, non-discriminatory reason to require plaintiff's medical evaluation in light of the information received from plaintiff and his doctor.  At plaintiff's December 21, 2015, deposition, he testified he "has pain every day, it's just a matter of what pain."  (Kozak Aff. Ex. G-1 ("Kosack Dep.") at 97).  When asked if an injury could occur at any time, plaintiff responded, "Absolutely.  I have never hidden that from anybody."  (Id.).

Three weeks later, plaintiff notified his supervisors he could not work because he was experiencing serious medical problems related to high blood pressure and a possible stroke, in several emails plaintiff sent from January 11 to January 18, 2016.  On January 18, 2016, plaintiff's doctor also submitted a note and an FMLA certification that (i) requested, among

other things, a temporary reduction in plaintiff's hourly schedule to ten hours a day for five days a week for the next month, and (ii) noted "a shorter workweek will not aggravate" plaintiff's vertigo as much. (Kozak Aff. Ex. KKK). Plaintiff's long history of medical issues, recent statements about constant pain and the ever-present risk of injury, emergent absence from work shortly thereafter, and his own doctor's recommendation for a temporary—and possibly permanent—reduction in work all support defendants' legitimate, non-discriminatory reason for requiring a medical evaluation.

Plaintiff argues that reason was pretextual, because defendants ordered the exam in early 2016 shortly after plaintiff was deposed in late 2015. But Entergy asked plaintiff—and plaintiff consented—to undergo similar medical evaluations in 2005, 2010, and 2012. Plaintiff also argues pretext is apparent because the resulting ten-hour cap was arbitrary: plaintiff had previously worked twelve-hour shifts and a ten-hour cap had no medical support. To the extent plaintiff worked twelve-hour shifts in September 2015, plaintiff's capabilities then were not determinative of his capabilities in early 2016. The ten-hour cap was recommended by medical professionals. Indeed, plaintiff's own doctor recommended the same hours reduction on a temporary basis and noted the company should consider a permanent reduction in his work week. Plaintiff submits no contrary medical testimony that says this restriction is unfounded.

Plaintiff's arguments lack evidentiary support and would not lead a reasonable factfinder to infer, by a preponderance of the evidence, that defendants' reasons were pretextual.

Accordingly, defendants are entitled to summary judgment on plaintiff's claims for retaliation under the ADA and NYSHRL.

C.    FMLA Interference

Finally, plaintiff claims Entergy interfered with the FMLA when it did not provide him with intermittent FMLA leave, which would have allowed him to comply with the ten-hour cap by using FMLA leave when required to work overtime. Defendants argue plaintiff's FMLA interference claim fails, because plaintiff did not give sufficient notice that he sought intermittent FMLA leave, and ultimately, was not denied FMLA leave.

The Court agrees with defendants.

Interfering with, restraining or denying an employee's rights under the FMLA is unlawful. 29 U.S.C. § 2615(a)(1). To establish a prima facie claim of FMLA interference, a plaintiff must show by a preponderance of the evidence that: "1) that [he] is an eligible employee under the FMLA; 2) that the defendant is an employer as defined by the FMLA; 3) that [he] was entitled to take leave under the FMLA; 4) that [he] gave notice to the defendant of [his] intention to take leave; and 5) that [he] was denied benefits to which [he] was entitled under the FMLA." Graziadio v. Culinary Inst. of Am., 817 F.3d 415, 424 (2d Cir. 2016). The question is essentially "whether the employer in some manner impeded the employee's exercise of his or her right." Potenza v. City of New York, 365 F.3d 165, 168 (2d Cir. 2004) (per curiam). "The alleged interference must ultimately result in a denial of a benefit under the FMLA." DeAngelo v. Yellowbook Inc., 105 F. Supp. 3d 166, 182 (D. Conn. 2015).

Plaintiff fails to identify any evidence showing that Entergy impeded the exercise of his FMLA rights or denied him FMLA benefits. Indeed, it is undisputed that from January 11 until his termination in April 2016, Entergy provided plaintiff with some combination of FMLA and paid administrative leave.

Plaintiff argues defendants should have allowed him to apply for intermittent FMLA leave. Plaintiff offers no evidence, however, that he gave defendants sufficient notice that he sought intermittent FMLA leave, and the law does not require an employer to be "clairvoyant." Slaughter v. Am. Bldg. Maint. Co. of New York, 64 F. Supp. 2d 319, 326 (S.D.N.Y. 1999). While the record reflects correspondence in March 2016 between the parties' legal counsel about plaintiff's seeking "reasonable accommodations" for another position at Indian Point, the letters do not refer to plaintiff's FMLA leave or to any dissatisfaction with the administrative paid leave he had received.

To the extent plaintiff argues defendants were required to provide separate and additional notice of the right to take intermittent FMLA leave, such inadequate notice would still not constitute interference. Failure to provide employees with adequate notice of FMLA procedures may constitute FMLA interference "if the lack of notice caused the employee to forfeit FMLA leave." Geromanos v. Columbia Univ., 322 F. Supp. 2d 420, 430 (S.D.N.Y. 2004). As noted, plaintiff received a combination of FMLA and paid administrative leave for thirteen weeks before his termination.

Accordingly, defendants are entitled to summary judgment on plaintiff's FMLA interference claim.

## CONCLUSION

Plaintiff either withdrew or did not oppose defendants' motion for summary judgment as to his ERA, FMLA, and NYSHRL claims related to his work in the Security Department, and his FMLA and ERA claims related to the HCM process. Plaintiff's ERA claim related to the receipt inspector position is time-barred. Accordingly, these claims are DISMISSED.

Defendants' motion for summary judgment is GRANTED as to plaintiff's (i) ADA disparate treatment claim related to his work in the Security Department; (ii) ADA

discrimination claim related to the HCM process; (iii) ADA and NYSHRL failure to accommodate claims related to the receipt inspector position; (iv) FLSA claim for unpaid overtime; (v) ADA and NYSHRL retaliation claims related to his termination; and (vi) FMLA interference claim. Accordingly, these claims are DISMISSED.

      Defendants' motion for summary judgment is DENIED as to plaintiff's ADA and NYSHRL claims for disability discrimination and failure to accommodate in connection with his termination.

      All counsel are directed to appear at a case management conference on March 4, 2019, at 11:30 a.m., at which time the Court will set a trial date and a schedule for pretrial submissions.

      By February 25, 2019, the parties shall submit a joint pretrial order in accordance with the Court's Individual Practices.

      The Clerk is instructed to terminate the motion. (Doc. #74).

Dated: January 25, 2019
      White Plains, NY

                       SO ORDERED:

                       Vincent L. Briccetti
                       United States District Judge